# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
-----------------------------x
DEVAN MOTORS OF FAIRFIELD,      :
INC. D/B/A INFINITI OF          :
FAIRFIELD                       :
                                :
         Plaintiff,             :
v.                              :    Civ No. 3:04CV00308(AWT)
                                :
INFINITI DIVISION OF NISSAN     :
NORTH AMERICA, INC.,            :
                                :
         Defendant.             :
                                :
-----------------------------x
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Devan Motors of Fairfield, Inc. d/b/a Infiniti of Fairfield ("Devan"), brings this action against the defendant, Infiniti Division of Nissan North America, Inc. ("Infiniti"), alleging violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a et seq. ("CUTPA"), breach of contract, and breach of the implied covenant of good faith and fair dealing. The defendant has moved for summary judgment. For the reasons set forth below, the defendant's motion is being granted as to the breach of contract claim and denied as to the other claims.

## I.    FACTUAL BACKGROUND

### A.    Devan's Negotiations with Infiniti to Purchase the New Country Dealership

In late 2001, Michael Cantanucci ("Cantanucci") decided to

sell the assets of New Country Infiniti ("New Country"), a
dealership he owned in Greenwich, Connecticut.  Jonathan
Brostoff ("Brostoff") and Marc Blitzer ("Blitzer"), the
principals of Devan, entered into negotiations with Cantanucci
for the purchase of New Country.  Brostoff and Blitzer could not
find another location in Greenwich from which to operate the
Infiniti dealership.[1]  Therefore, they proposed to purchase New
Country and relocate the dealership to a site on Post Road in
Fairfield, Connecticut, approximately 20 miles away from the
Greenwich site.

On December 31, 2001, Brostoff and Blitzer entered into a
lease agreement for the property on Post Road in Fairfield.  The
lease had a term of four and one-half years with two five-year
extension options.  On January 28, 2002, Brostoff and Blitzer
entered into an Asset Purchase Agreement to buy the assets of
New Country.  Pursuant to this agreement, the purchase price for
New Country's customer lists and dealership goodwill was
$725,000.  The lease agreement and the Asset Purchase Agreement
were both contingent on Infiniti's approval of the purchase and
relocation of the dealership to Fairfield.

On January 29, 2002, Cantanucci submitted the proposal to

---

[1] Cantanucci planned to expand the service department of
another dealership he owned into the space that was occupied by
New Country, and there were no other available sites for an
Infiniti dealership at the time within the town of Greenwich.

Infiniti's regional office.  Initially, the proposal caused some

concerns for Infiniti because of the twenty-mile relocation.  Ed

Sherman ("Sherman"), Infiniti's East Region Vice President,

recommended maintaining Greenwich as an "open point" for

placement of another dealer.[2]  Correspondence dated January 30,

2002 from John Busch ("Busch"), a market studies planner, to

Mike Leiter ("Leiter"), a market studies manager, summarized the

East Region's proposal as follows:

> The Region's proposal would be that if the buy/sell of
> New Country Infiniti and subsequent relocation were to
> be approved, that the Fairfield PMA [Primary Market
> Area] replace the Danbury Open Point and keep Greenwich
> as a separate PMA for the possibility of future
> Infiniti representation.  I think this proposal would
> require an in-field market study in order to better
> analyze the situation and review the Metro and
> surrounding Infiniti markets.

(Pl.'s Ex. 5 (Doc. No. 197)).[3]  In a January 31, 2002 email to

---

[2] An "open point" is an area which the company is seeking to
fill with a dealer.  See Def.'s Ex. 4 (Doc. No. 188) at 17; Pl.'s
Ex. 12 (Doc. No. 197) at 22; Pl.'s Ex. 18 at 110.  A "monitored
point" or a "monitored market" is an area that is being studied
or evaluated for the possibility of placing a dealership there in
the future.  See Def.'s Ex. 4 at 19; Pl.'s Ex. 12 at 23; Pl.'s
Ex. 19 at 55.  A "closed point" is an area that is no longer
available as a dealership location because a dealer has been
placed there or because an open point designation is not
warranted .  See Def.'s Ex. 4 at 19-20; Pl.'s Ex. 12 at 21; Pl.'s
Ex. 13 at 39-40.

[3] A dealer's Primary Market Area ("PMA") is a defined by
Infiniti's Dealer Sales and Service Agreement as "the geographic
area which is designated from time to time as the area of
Dealer's sales and service responsibility for Infiniti Products
in a Notice of Primary Market Area issued by Seller to Dealer."
(Pl.'s Ex. 25 at § 1K).   In his deposition, Sherman agreed that
the Region proposed to keep Greenwich as a separate PMA, but did

Mark McDowell ("McDowell"), a market representation manager,
Leiter stated:

> Market Study's would support the proposed relocation
> from Greenwich to Fairfield from a location standpoint.
> However, because the relo distance is substantial (20.5
> air miles) a realignment of PMA's would be
> necessary...an infield market study would probably come
> to the conclusion that the market should be realigned
> to include a White Plains PMA, the Fairfield PMA, the
> New Haven PMA and a Monitored Market/Open Point in
> Greenwich.

(Pl.'s Ex 16).  Infiniti contacted three other dealers to
determine whether they were interested in acquiring New Country
and remaining in Greenwich.[4]  Because there were no facilities
available for a dealership in Greenwich, Infiniti's efforts to
maintain a franchise there were unsuccessful.  On February 25,
2002, John Manfra ("Manfra"),  the assistant manager of
Infiniti's local region, informed McDowell that "there is no
viable solution to acquiring an alternative location in

---

not recall discussing the Danbury open point.

[4] Brostoff claims that Infiniti withheld important
information obtained in a February 20, 2002 meeting with Ron
Pecunies ("Pecunies"), the owner of a Cadillac dealership next to
New Country.  A memorandum from Infiniti's John Manfra noted that
Pecunies stated the following: "Currently, Infiniti's R.O.I. is
not attractive.  The Greenwich rent factor is high.  The Infiniti
net profit is low.  Might look more favorably on Infiniti in the
future based on success of new product plan.  Needs to expand
Mercedes facility.  Did approx. 1800 units last year.  Mr.
Pecunies owns the Cadillac facility across the street from New
Country Infiniti.  Tenant's lease expires in 18 months.  Mr.
Pecunies plans to expand Mercedes into the current Cadillac
Facility." (Pl.'s Ex. 14).  The memorandum concludes that "Mr.
Pecunies has minimal interest and no available facility in
Greenwich."  (Id.).

Greenwich" and recommended proceeding with the "Cantanucci buy/sell re-location proposal." (Pl.'s Ex. 15).

Brostoff claims that, prior to the closing, he had several conversations with Infiniti representatives that misrepresented the company's intentions with respect to the Greenwich dealership. In April 2002, McDowell told Brostoff that Devan was "replacing the Greenwich dealer, except for the town of Greenwich," which would be reassigned to Pepe Infiniti ("Pepe") in White Plains, New York. (Def.'s Ex. 2 (Doc. No. 188) at 102). Infiniti provided Brostoff with maps reflecting this alignment. In April 2002, Manfra told Brostoff, "You are now the Greenwich dealership. You're moving the Greenwich dealership." (Id. at 109). In addition, Manfra and Marc McNabb ("McNabb"), former Infiniti Vice President and General Manager, told Rich Fisher ("Fisher"), the former General Manager of Devan, that the Greenwich point was "closed." (Def.'s Ex. 11 at 272, 274). During these conversations, however, Infiniti representatives never told Brostoff or Fisher that Infiniti would not reopen another dealership in Greenwich after Devan's relocation to Fairfield.[5]

---

[5] Initially, Fisher submitted an affidavit, in which he averred, "Mr. Manfra told me that Infiniti would not reopen a new Greenwich Infiniti store if Devan's relocation of the Greenwich dealership to Fairfield was approved....When I again raised the issue of Infiniti opening a new store in Greenwich, Mr. Manfra told me that Infiniti had 'given up the right to open a store in Greenwich.' I had several further conversations on the same

In late April 2002, Infiniti approved Devan's purchase of
New Country and its relocation to Fairfield.  On April 23, 2002,
McDowell sent a letter to Cantanucci, Brostoff, and Blitzer,
advising them of Infiniti's approval of the proposal and its
intention to enter into a Dealer Term Sales and Service
Agreement (the "Agreement") with Devan.  The letter also states
that Infiniti would be "evaluating the impact of [the]
relocation on the definition of the resulting Primary Market
Area for Buyers."  (Def.'s Ex. 6).  On April 29, 2002, Brostoff
signed a written acknowledgment confirming that Greenwich would
not be located within Devan's PMA because it would be assigned
to Pepe.  Devan would have the rest of the market area
previously assigned to New Country.

### B.   Devan's Agreement With Infiniti

On April 30, 2002, the Agreement was signed by Devan and
Infiniti.  At the time he entered into the Agreement, Brostoff
had been involved in the ownership and operation of another

---

topic with Mr. Manfra in which he consistently responded that
'Greenwich' had been closed and could not be reopened after the
'Point' was relocated to Fairfield." (Pl.'s Ex. 39, ¶¶ 9-10).
Fisher also averred that he told McNabb that his "only concern
was over the possibility that Infiniti would open a new store in
Greenwich and thereby undermine the relocated Fairfield
dealership.  Mr. McNabb told me that would not happen, because
the Greenwich Point had been closed."  (Id. ¶ 11).  However, in a
subsequent deposition, Fisher testified that "Mr. Manfra never
said that Infiniti could never reopen a point" and that McNabb
never said that the Greenwich point could not and would not be
reopened. (Def.'s Ex. 11 at 272, 274).  Fisher testified that the
language in his affidavit was added by Devan's attorneys.

automobile dealership for several years and had previously entered into similar agreements with other manufacturers. The "Introduction" to the Agreement stated in part: "Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the consuming public." (Pl.'s Ex. 25 at 1). The "Introduction" to the Agreement also stated in part: "Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Dealer or Infiniti Products and shall engage in no discourteous, deceptive, misleading or unethical practices or activities." (Id.).

The Agreement contained the following provisions relating to dealership location and facilities:

Section 2. Dealership Location and Dealership Facilities

A. Location and Facilities

Dealer shall provide, at the Dealership Location approved by the Seller in accordance with Section 2.B hereof, Dealership Facilities that (i) will enable Dealer to effectively perform its responsibilities under this Agreement; (ii) are satisfactory in space, appearance, layout, equipment, signage; and (iii) are otherwise substantially in accordance with the Guides and Standards therefor established by Seller and the Facilities Standards Manual, as the same may be issued to Dealer from time to time. Dealer shall conduct its Dealership Operations only from the Dealership Location specified in the Dealership Facilities Addendum.

B. Dealership Facilities Addendum

Dealer and Seller will execute a Dealership Facilities Addendum which will include a description of the Dealership Location and the Dealership Facilities, the approved use for each such place of business and facility, and the current Guides therefor.

C. Changes and Additions

Dealer shall not move, relocate or change the usage of the Dealership Location or any of the Dealership Facilities, or substantially modify any of the Dealership Facilities, nor shall Dealer...directly or indirectly establish or operate any other locations or facilities for the sale or servicing of Infiniti Products or for the conduct of any other of the Dealership Operations contemplated by this Agreement, without the prior written consent of the Seller. Any changes in the Dealership Location or in the Dealership Facilities that may be agreed to by Seller and Dealer shall be reflected in a new, superseding Dealership Facilities Addendum executed by Seller and Dealer...

D. Development of Market Studies

Seller may, from time to time and in its sole discretion conduct studies of various geographic areas to evaluate market conditions....Such studies will make recommendations concerning the market, the Dealership Facilities, and the Dealership Location. Prior to conducting a study which includes the geographic area in which the Dealer's Primary Market Area is located, Seller will notify Dealer of its intention to conduct such a study. Dealer will be given the opportunity to present to Seller such information pertaining to such study as Dealer believes may be relevant. Seller will consider all relevant information timely provided by Dealer before concluding its study.

E. Evaluation of Dealership Facilities and Location

Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 2. In making such evaluations, Seller will give consideration to: the actual land and building space provided by Dealer for the performance of its responsibilities under this Agreement; the current Guides and Standards established by Seller for the Dealership Facilities; the appearance, condition and

layout of the Dealership Facilities; the location of
the Dealership Facilities relative to the sales
opportunities and service requirements of the Primary
Market Area; and such other factors, if any, as may
directly relate to Dealer's performance of its
responsibilities under this Section 2.  Evaluations
prepared pursuant to this Section 2.E will be discussed
with and provided to Dealer, and Dealer shall have an
opportunity to comment, in writing, on such
evaluations, and Seller will consider Dealer's
comments.  Dealer shall promptly take such action as
may be required to correct any deficiencies in Dealer's
performance of its responsibilities under this Section
2.

(<u>Id.</u> at §2).  The Agreement specified the sales obligations of

the dealer as follows:

Dealer shall actively and effectively promote through
its own advertising and sales promotion activities the
sale at retail (and if Dealer elects, the leasing and
rental) of Infiniti Vehicles to customers located
within Dealer's Primary Market Area....Dealer agrees
that it has no exclusive right or interest in any such
geographic area which Seller may designate; that Seller
may add, relocate or replace dealers in Dealer's
Primary Market Area; and that Seller may, in its
reasonable discretion, change Dealer's Primary Market
Area from time to time.

(<u>Id.</u> at § 3A).  The Agreement also contained a merger clause,

which provided:

This Agreement contains the entire understanding of the
parties hereto with respect to the subject matter
contained herein and may be amended only by a written
instrument executed by each of the parties or their
respective personal representative, successors, and/or
assigns.  This Agreement supercedes any and all prior
agreements with respect to the subject matter hereof,
and there are no restrictions, promises, warranties,
covenants or undertakings between the parties other
than those expressly set forth in this Agreement.

(<u>Id.</u> at § 15E).  The Agreement did not contain any

representation by Infiniti that it would not approve a new
Greenwich dealer for any specific period of time, and Devan did
not request any exception to the Agreement that would prevent
Infiniti from adding a dealer in Greenwich after its relocation
to Fairfield.  Notwithstanding the language of the Agreement,
Brostoff believed that Infiniti's representation that Devan
replaced the Greenwich dealership was fundamental to the
Agreement.

Devan began operating the Fairfield dealership in May 2002.
On May 1, 2002, Infiniti sent a letter to the Commissioner of
the Department of Motor Vehicles for the State of Connecticut
(the "DMV"), stating:

> Devan Motors of Fairfield, Inc. dba Devan Infiniti of
> Fairfield is a replacement dealer for New Country Motor
> Cars of Greenwich, Inc. dba New Country Infiniti of
> Greenwich....Subsequent to the relocation, Infiniti
> will change Devan Motors of Fairfield, Inc. dba Devan
> Infiniti of Fairfield's area of responsibility and it
> will no longer include Greenwich and surrounding census
> tracks.

(Def.'s Ex. 13) .  On May 2, 2002, Infiniti contacted George
Harte ("Harte"), the owner of an Infiniti dealership in West
Haven, Connecticut, to inform him that Devan and Infiniti had
entered into the Agreement.  At that time, Sherman explained to
Harte "that the Fairfield dealership was not an additional
dealership, but rather the relocation of a current dealer."
(Pl.'s Ex. 26).  Brostoff claims that he had a discussion with
McNabb, in November 2002, in which he was again informed about

Infiniti's intentions with respect to a dealership in Greenwich. Specifically, McNabb "told [Brostoff] that Ed Sherman had wanted to have [Brostoff] buy the dealership, move it to Fairfield, and then put another dealer in Greenwich. But [McNabb] would not allow it." (Pl.'s Ex. 2 at 121). On April 11, 2003, Devan and Infiniti entered into a permanent Dealer Sales and Service Agreement, which contained the same relevant provisions as the Agreement, which had been signed on April 30, 2002.

### C. Infiniti's 2003 Market Study and its Implications

In early to mid-2003, Infiniti began a market study of the New York Demographic Market Area, including Fairfield County, to determine whether an adjustment was required to its dealer network.[6] The study was performed in three segments, with the Fairfield County portion of the study beginning around September 2003.[7] In August 2003, Stephen Burack ("Burack"), Infiniti's Dealer Operation Manager, called Brostoff to inform him of the market study. On August 27, 2003 Gary Frigo ("Frigo"), Vice President of Infiniti's East Region, advised Brostoff that

---

[6] Gary Frigo of Infiniti testified that the study was conducted because of (1) the size of the New York market, (2) the relatively poor performance of the New York region when compared to national market share averages, (3) the absence of such a study within the past decade, (4) the changing nature of the franchise, and (5) the boom in the luxury car market.

[7] The Northern New Jersey and New York City portions of the study were conducted earlier in 2003, although it is unclear exactly when they were commenced.

Infiniti would be conducting a market study in the Fairfield area and invited him to provide any information relating to the study within thirty days.  On September 4, 2003, Brostoff responded to the letter with his comments about the study and stated that Devan would be exploring opportunities to relocate within Fairfield County.  In August or September 2003, Burak called Ron Pecunies ("Pecunies") to discuss his interest in opening an Infiniti dealership in Greenwich.  Subsequently, Burak and Pecunies exchanged documents related to the acquisition by Pecunies of a franchise in Greenwich.

In October 2003, Infiniti's market study was released.  The study's executive summary notes that one of its purposes was to "assess the viability of the Greenwich CT, New Rochelle/Longmont NY, Wappingers Falls NY and the Mt. Kisco/Goldens Bridge NY market's [sic] for possible Infiniti representation."  (Pl.'s Ex. 32).  The study recommended declaring an open point in Greenwich.  Specifically, it concluded:

> Devan Infiniti should provide exclusive, stand alone Infiniti sales, service and parts facilities, at the current location....Infiniti Division should establish exclusive stand alone Infiniti sales, service and parts facilities in the Greenwich CT market.  The preferred location is in the vicinity of the existing Greenwich Cadillac Olds facility on W. Putnam Avenue in Greenwich.

(Pl.'s Ex. 33).  The study concluded that placing a dealership in Greenwich would increase Infiniti's market representation in Fairfield County.

In November 2003, Infiniti informed Pecunies of the results
of the study, and Pecunies continued the process of securing
approval for his dealership site in Greenwich.  On December 22,
2003, Infiniti sent Pecunies a letter of commitment to enter
into a dealer agreement for a dealership at 217 West Putnam
Avenue in Greenwich.  On January 6, 2004, Infiniti first
informed Brostoff of the results of the market study.

Devan's expert, Robert B. Dilmore, Sr. ("Dilmore"),
concluded that Infiniti's market study was deficient in several
respects.  First, he concluded that the market study did not
comply with industry standards due to the following factors:

> the placement would occur at a point from which an
> existing dealer purchased and then relocated his
> dealership, the existing dealer was not provided with
> notice of the initiation of the market study, the
> existing dealer was not provided with notice of the
> purpose of the study, the manufacturer did not provide
> information about the impact of placing a dealer back
> into a town from which the existing dealer had
> purchased his dealership, and the existing dealer was
> not offered an opportunity to provide the additional
> location.

(Pl.'s Ex. 37 at 7).  Second, he concluded that Infiniti failed
to provide Devan with an adjustment period before evaluating the
market:

> Under normal circumstances a period of eighteen (18) to
> twenty-four (24) months is generally provided to a new
> dealer before the manufacturers and distributors expect
> the dealer to demonstrate sales success in the
> market....If a manufacturer or distributor conducts a
> market study during the eighteen (18) to twenty-four
> (24) month time period following a change of ownership
> and a relocation of that dealership, then the data and

-13-

> information obtained as part of the market study will
> not reflect the new, relocated dealer's expected sales
> performance, primarily because of the ownership change
> and relocation, and the resulting customer and market
> disruption and confusion.

(Id. at 8-9).  Third, Dilmore concluded that Infiniti's

appointment of a new Greenwich dealer deprived Devan of the

value of the goodwill purchased from New Country.  Dilmore noted

that, in his experience, he had "never seen a manufacturer or

distributor approve an Asset Purchase Agreement involving the

transfer of a dealership's goodwill and then proceed, within a

relatively short period of time, to redraw the new dealer's

Primary Market Area...."  (Id. at 9).  Finally, Dilmore

concluded that Infiniti's appointment of a new Greenwich dealer

caused ascertainable loss to Devan.  Because of the Greenwich

dealer's "proximity advantage," Dilmore concluded that the

addition of the Greenwich dealer would diminish Devan's new

vehicle sales, used car sales, and service and parts business.

Joseph F. Roesner ("Roesner"), another expert for Devan,

calculated the cumulative lost net profit as a result of

Infiniti's placement of a new dealer in Greenwich to be

$3,739,327 in 2007 dollars.  (Pl.'s Ex. 40 at 13).

###     D.    Devan's Proposed Relocation to Wilton

In early 2004, Devan filed the instant action against

Infiniti.  On or about May 28, 2004, Devan proposed to relocate

its dealership facility to Stamford, Connecticut.  On June 8,

2004, Infiniti denied that request.  On October 12, 2005, Devan

submitted another request to Infiniti to relocate its

dealership, this time from its location in Fairfield to 190

Danbury Road in Wilton, Connecticut.  In a letter to Burack

dated October 12, Brostoff stated that the Wilton location would

have the following advantages:

> First, Wilton and its surrounding towns have some of
> the best demographics in the country important for a
> high line franchise like Infiniti.  According to
> Claritas (2003 data), within 7 miles of the site there
> are 161,671 people with an average age of 38 and an
> average household income of $150,810.  Second, Wilton
> is surrounded 360 degrees by these wealthy towns-
> convenient for customers located in any direction.
> Third, while Wilton is an excellent location to service
> our current southeastern Fairfield County market, the
> location will enable us to better service customers in
> Northern Fairfield County and Northern Westchester
> where Infiniti lacks representation.

(Def.'s Ex. H (Doc. No. 191)).  Brostoff also noted that Bob

Sharp Nissan, another dealership located in Wilton, sold more

vehicles in 2004 than any other dealer in Fairfield County, and

according to its website, was the largest volume Nissan dealer

in the state.  After receiving Brostoff's request, Infiniti

asked Burack to visit the proposed site in Wilton.

 On or about October 19, 2005, Burack visited the Wilton

site with Brostoff.  Initially, Burack thought the proposal was

"interesting."  (Pl.'s Ex. F. (Doc. No. 198) at 42).  Burack

noted the following positive features of the Wilton site: it was

a single facility; it would provide numerous service bays; it

was located within Devan's existing primary area; and the location was zoned for automotive use.  He also noted the following negative features: it was located outside the I-95 corridor, it was near the Danbury area, it would require extensive renovation, and it would require further investigation by the national market studies group.  Burack did not have final decision-making authority over the relocation request.  Burack told Brostoff that Infiniti's regional and national offices would have to evaluate the proposal before the relocation could be approved.

After his visit, Burack reported to Jeff Harris ("Harris"), Infiniti's East Region Vice President, who requested that Infiniti conduct an analysis of the relocation request.  Thereafter, Burack made a second visit to the Wilton location with McDowell and Jim DeTrude ("DeTrude"), the assistant regional manager.   On October 20, 2005, McDowell noted in an email to others at Infiniti that the proposed site "has some potential."  (Pl.'s Ex. S.).  McDowell stated that additional information would be required in order to conduct a proper evaluation.

On October 26, 2005, Brostoff sent a letter to Harris, in which he shared his disappointment with Devan's sales performance and described the proposed move to Wilton as a

potential solution to that problem.[8]  Brostoff stated that Devan

sold most of its vehicles to customers located west of

Fairfield, close to the Wilton site.  Brostoff noted that the

Wilton site provided a large building surrounded by 18 service

bays.  In addition, Brostoff stated that Devan would benefit

from being in an area surrounded by wealthy towns and located

along the heavily-traveled Route 7.  In a relocation proposal

dated December 13, 2005, Kenneth Hyland ("Hyland"), a business

advisor to Devan, reiterated many of the advantages of the

proposed Wilton location.  Hyland noted that Wilton provided a

location that was convenient to Infiniti's customers and a

facility that would allow for the growth of Devan's operations.

He also noted that sales opportunities were limited at the

Fairfield location and that the Wilton location provided better

demographics for sales of Infiniti vehicles.

     Prior to making a visit to the Wilton location himself,

Harris called the market studies department to check on the

status of its analysis.  People in that department informed

Harris that the analysis did not look favorable to relocation,

but the analysis was not yet complete.  On December 12, Harris

sent an email to Brostoff, which stated:

> I got some preliminary information from the Market
> Studies group in California this morning, and it wasn't

---

[8] In letters dated July 17, 2005 and October 14, 2005,
Infiniti noted Devan's deficient sales performance.

> positive...They said the registration analysis,
> customer convenience mapping, and demographic/household
> incomes does not support the area as well as the area
> you are currently in.  Lack of competitive luxury makes
> was also a factor.

(Pl.'s Ex. L).  On December 14, 2005, Harris and Burack visited

the Wilton location.  Harris expressed concern about the

proposed location because it was in a wooded area far from the

I-95 corridor where most luxury dealers are located.

After the visit, Harris and Burack met with Brostoff to

discuss their thoughts.  Harris again explained that although

the market studies department had not yet completed its

analysis, the analysis was not looking favorable to the

relocation request.  Burack described the meeting in a

memorandum dated December 14:

> Mr. Harris explained that he was not impressed with the
> area as the potential relocation site of the Infiniti
> dealership versus the current location.  Mr. Harris
> added the building at the proposed site appeared
> adequate and the increase in facility area for the
> Parts and Service Dept. would be an improvement over
> their current facilities.  However there were no other
> dealerships in the Competitive Set in this area and
> that the impact on shopping patterns and traffic
> patterns would probably not benefit the potential of
> success at the proposed relocation site as they would
> be moving away from the largest section of the luxury
> market.

(Pl.'s Ex. W at 2).  According to Burack, Brostoff was

"shocked" at Infiniti's response to the proposal and stated that

he could "guarantee" a large sales increase at the Wilton

location.  (Id.).  Burack noted that Brostoff believed that

relocating to Wilton would provide a solution to Devan's deficient sales performance in Fairfield. Burack also noted:

> Additionally he [Brostoff] added that their Acura dealership (Devan Acura) in Norwalk, CT was in a downtown location and competed very well in an area away from other dealerships. He also went on to add that Bob Sharp Nissan was located further north of the proposed relocation site on Wilton Road (Rte. 7) in an area that was not in an area of automotive dealerships and not [sic] located in an area that he felt was not as good as the proposed relocation site. He noted the large sales performance of Bob Sharp Nissan as [sic] saying he believed they were the largest Nissan dealership in the State of CT. Mr. Brostoff went on to say that relocation was a topic they had discussed on an ongoing basis since they had become an Infiniti dealer. He explained they moved and relocated to the current location in Fairfield CT because it was the only automotive facility available when they purchased the franchise from the New Country Dealership Organization in Greenwich, CT. Additionally they had presented a potential relocation site in Stamford CT and that Infiniti declined that proposal. He also noted that relocation had been discussed in his conversations with the writer. The writer noted that the topic of relocation had been discussed during contacts. The writer noted that this current proposal was an interesting proposal for review versus other areas in their PMA when they had informed him that they submitted a proposal to the Infiniti East Region for review and National approval after negotiating with the current owner of the property.

(Id. at 2-3). According to Burack, Harris informed Brostoff that Infiniti was unlikely to approve the relocation request because of his concerns with the site and the likely outcome of the market study. Burack noted, "Mr. Harris asked Mr. Brostoff and Mr. Blitzer regarding the potential of selling the dealership," but they stated that they did not want to sell it. (Id. at 3).

After the meeting with Brostoff, Harris received the final market analysis evaluating the relocation proposal. Infiniti's December 2005 Fairfield market analysis reached the following conclusions:

There is no luxury representation in the vicinity of the proposed location.

Customer convenience, which is currently above primary competitive brands, shows a reduction in the average distance to the Infiniti dealers in the study area, with the relocation to Wilton Motors due to the geographic boundaries of the PMA. The coastline areas of Long Island Sound versus the Wilton Market which is 5 to 6 miles north of the sound, changes the convenience analysis due to the geography density.

The Wilton location would place Infiniti in an area with a higher median household income level, but with a lower population and household density compared to both the current Fairfield Market and Westport Market.

The competitive luxury registration base for the proposed Wilton Market would increase from the current level of 7,971 (Sept 2005 annualized) to 9,776. The proposed Wilton revisions would impact the Greenwich PMA luxury registration base from the current level of 9,195 to 6,823.

(Pl.'s Ex. N. at 47). After reviewing the analysis, Harris called Brostoff to inform him that Infiniti was denying the relocation request to Wilton but would consider any possible relocation to more favorable sites. In a December 21, 2005 contact report, Harris stated:

I called Jonathon Brostoff the morning of December 21 to discuss his proposed relocation to Wilton. I advised Mr. Brostoff that the analysis by National Market Rep and Urban Science confirmed my previous statements to him that Infiniti would not approve the proposed site.

I reiterated my concerns that I voiced during my visit
of December 14, which was the fact that there is no
competitive luxury representation in the Wilton market,
and that the proposed Wilton location would place
Infiniti away from luxury competitors and the I-95
corridor.  I told Mr. Brostoff that the independent
analysis came to the very same conclusion....

The current Infiniti location sits between Lexus and
MB, and Infiniti benefits from that luxury shopping
pattern.  I confirmed that our analysis also indicated
that Wilton has a higher household income; however it
has a lower population and lower household density than
the Fairfield market.

I went on to state that I have to look at Infiniti's
representation in the market in a different context
than just his dealership....The analysis says that his
current location meets customer needs in the context of
the entire market better than the proposed location.

Finally, I stated that his proposed location could have
other implications as well.  At this time, we do not
intend on filling the Danbury point any time soon,
however, it is a monitored market for Infiniti that we
may some day establish representation.  Mr. Brostoff's
proposed relocation would have long term implications
on surrounding markets like Danbury.  I emphasized that
this was a very small factor in the decision process,
and that the primary reason for rejecting his proposal
was proximity to other luxury car dealers.

(Def. Ex. K).  In a December 21, 2005 letter, Harris confirmed

Infiniti's decision.  The letter stated that the analysis

"concluded that there is no competitive luxury representation in

the Wilton market, and the proposed site would place Infiniti

away from luxury competitors and the I-95 corridor."   (Def.'s

Ex. L).  The letter stated that Infiniti determined the

Fairfield market to be "better suited to compete with

competitive luxury makes."  (Id.).   It also stated that the

October 2003 market study concluded that Devan should provide
Infiniti representation at its current location in Fairfield.

The plaintiff has submitted the expert witness report of
Roesner, who concluded that the Wilton location is superior to
the Fairfield location for Infiniti sales based on Infiniti's
own market study.  Roesner notes that the Wilton location is
desirable because of its proximity to high income households and
buyers of luxury vehicles.  Roesner concludes that Infiniti's
analysis "indicates that Luxury Car + Truck registrations in the
market would increase by 22.6%, Planning Volume would increase
by 61.1%, and the number of Units in Operation would increase by
18.3%," and that these three measures "show the potential for
greater success for Devan at the relocation site than at its
current location."  (Pl.'s Ex. O at ¶ 48).  He also states that
Infiniti's analysis "shows that Infiniti's customer convenience
would improve if Devan were to relocate from Fairfield to
Wilton" because "for actual and Expected Infiniti buyers as well
as for higher income households, a relocation of Devan to the
Wilton point would decrease the distance on average that one has
to travel to get to an Infiniti dealership."  (Id. at ¶ 49).  He
also concludes that "the Proposed Devan Relocation site is
comparable to the current Fairfield site in terms of proximity
to competitors...whether the proximity measure is drive time,

drive distance, or air distance." (Id. at ¶50).[9]  Finally, he

concludes that Infiniti's analysis "shows that, by selling with

equal effectiveness, at distances out to 20 miles, if Devan had

been located in Wilton, in each year 2003 to 2006 its sales

would have been substantially higher than those actually sold

within 20 miles." (Id. at ¶ 58).  In addition, Dilmore

concludes in his expert report that Infiniti's refusal to allow

Devan to move the dealership to Wilton deprived Devan of the

opportunity to better serve Infiniti customers and increase

market penetration in Fairfield.  (Pl.'s Ex. V at ¶¶ 28-29).

   Brostoff contends that Infiniti retaliated against Devan

for filing this action by not approving the proposal to relocate

to Wilton.  When asked about the basis for this claim, Brostoff

responded:

> The information in the packet, the Urban Science
> information, the data, and now your market study
> actually showing that this is going to be a better
> location for us, I think was overwhelming in light
> especially of the fact that we were getting these RSE
> deficiency letters.
>
> I also know that Steve Burack had liked the location.
> I know that he had spoken to –  I believe that he spoke
> to Jeff Harris about his feelings, and maybe even Mark
> Igo.
>
> I believe that the fact that I was in a lawsuit had
> come up multiple times in the meeting when they were

---

[9] However, Roesner concedes that there are no luxury brands,
with the possible exception of Buick, within five miles of the
Wilton location, and that other luxury dealerships are located
much closer to the I-95 corridor.

discussing this relocation.

(Pl.'s Ex. C at 299-300).  As a result of being involved in active litigation with Infiniti, Devan also was not considered eligible for an award of excellence.

 After Infiniti denied Devan's request to relocate to Wilton, Devan proposed to move from the its current location on Post Road in Fairfield to a location on Commerce Drive in Fairfield.  Harris informed Devan that he would likely approve a proposed relocation to this site, which would keep Devan near luxury competitors on the I-95 corridor, and in 2007, the request was approved.

## II.  LEGAL STANDARD

 A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986); <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore, may not try issues of fact. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975). It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the

governing law." Id.  As the Court observed in Anderson: "[T]he
materiality determination rests on the substantive law, [and] it
is the substantive law's identification of which facts are
critical and which facts are irrelevant that governs."  Id.
Thus, only those facts that must be decided in order to resolve
a claim or defense will prevent summary judgment from being
granted.  When confronted with an asserted factual dispute, the
court must examine the elements of the claims and defenses at
issue on the motion to determine whether a resolution of that
dispute could affect the disposition of any of those claims or
defenses.  Immaterial or minor facts will not prevent summary
judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d
Cir. 1990).

When reviewing the evidence on a motion for summary
judgment, the court must "assess the record in the light most
favorable to the non-movant and . . . draw all reasonable
inferences in [its] favor."  Weinstock v. Columbia Univ., 224
F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v.
Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because
credibility is not an issue on summary judgment, the nonmovant's
evidence must be accepted as true for purposes of the motion.
Nonetheless, the inferences drawn in favor of the nonmovant must
be supported by the evidence.  "[M]ere speculation and
conjecture is insufficient to defeat a motion for summary

judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings because the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the nonmovant fails to meet this burden, summary judgment should be granted.

## III. DISCUSSION

### A.    First Count: CUTPA

Infiniti has renewed its motion for summary judgment with respect to First Count of the First Amended Complaint, which sets forth a claim that Infiniti violated CUTPA in connection with its approval of an Infiniti dealership in Greenwich after Devan's relocation to Fairfield.  CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b" may bring a civil action based on CUTPA.  Conn. Gen. Stat. § 42-110g.  Connecticut courts have adopted the Federal Trade Commission's "cigarette rule" used to ascertain whether a practice is unfair, looking at the following factors:

> (1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . All three criteria do not need to be satisfied to support a finding of unfairness.  A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

<u>Ventres v. Goodspeed Airport, LLC</u>, 275 Conn. 105, 155 (2005)
(citation omitted).  "'[T]he ascertainable loss requirement is a
threshold barrier which limits the class of persons who may
bring a CUTPA action seeking either actual damages or equitable
relief.'" <u>Parker v. Shaker Real Estate, Inc.</u>, 47 Conn. App. 489,
496 (1998) (citation omitted).  "'An ascertainable loss is a
deprivation, detriment [or] injury that is capable of being
discovered, observed or established.'" <u>Id.</u> at 496 (citation
omitted).  "A plaintiff need not 'prove a specific amount of
actual damages in order to make out a prima facie case [under
CUTPA].'"  <u>Service Road Corp. v. Quinn</u>, 241 Conn. 630, 639
(1997).  "A loss of prospective customers constitutes a
'deprivation, detriment [or] injury' that is 'capable of being
discovered, observed, or established.'" <u>Id.</u> at 644.[10]

 In the Order Re Motion for Summary Judgment (Doc. No. 121)
(the "Order"), the court concluded:

> As to the defendant's contention that the plaintiff has
> not produced evidence that creates a genuine issue of
> fact as to the  CUTPA claim set forth in the First
> Count of the First Amended Complaint, the motion is
> being denied because genuine issues of material fact
> exist, <u>inter</u> <u>alia</u>, as to whether the defendant
> concealed its intention to place a dealer back in
> Greenwich after representing to the plaintiff that the
> former Greenwich point no longer existed because the
> plaintiff had replaced the former Greenwich Infiniti
> dealer, and thus engaged in conduct that was immoral,

---

[10]  The plaintiff has also presented expert testimony in
support of a conclusion that the Devan has suffered an
ascertainable loss as a result of Infiniti's actions.

unethical, oppressive or unscrupulous.

(Order at 2-3).  Since the court issued the Order, additional
depositions have been taken.  In renewing its motion for summary
judgment on the First Count, Infiniti argues that, now that
discovery has been completed, Devan has not produced sufficient
evidence to support the factual contentions on which this claim
is based.

   Infiniti contends that, at the time of the Order, the court
was not aware of, or did not have a full understanding of, the
following facts obtained in discovery:  First, Brostoff
testified that McNabb told him that he would not allow another
dealership in Greenwich when he spoke to him in November 2002,
but no one from Infiniti represented to Brostoff that it could
never open another dealership in Greenwich in the future.
Second, Fisher now concedes that no one from Infiniti ever told
him that the Greenwich point could not be reopened.  Third,
Infiniti's letter to the DMV stated that Devan was the
replacement dealership for New Country but did not state that
there would be no Greenwich dealership in the foreseeable
future.  Fourth, Brostoff and Dilmore concede that, in
accordance with the Agreement, Devan had no ownership rights or
expectation of ownership in its PMA.  Fifth, although Infiniti
did not inform Devan of the 2003 study of the New York
Demographic Area before it was begun, Infiniti did inform Devan

of the study before the Fairfield County portion of the study was begun. Sixth, the analysis for the Fairfield County portion of the market study was completed 18 months after Devan's relocation, and the Greenwich point opened more than 24 months after Devan's relocation.[11] Finally, although one of the purposes of the market study was to assess the viability of the Greenwich market for possible Infiniti representation, witnesses from Infiniti testified that there was no predetermined plan to use the market study to approve a new dealer in Greenwich and that the study of the entire New York demographic was conducted to determine whether any adjustment was needed to its current dealer network.

However, Devan has produced evidence that Infiniti represented that Devan was replacing the Greenwich dealership and the Greenwich point was closed; that Devan was given responsibility for the PMA formerly associated with the Greenwich dealership, except for Greenwich itself, which was assigned to the White Plains PMA; and that Infiniti's Vice President and General Manager stated that he had refused to allow a plan for another dealership to be placed in Greenwich

_____

[11] Infiniti contends that this was an appropriate time frame, even according to Dilmore. However, Dilmore testified that under normal circumstances a new dealer would generally be given a period of 18 to 24 months to demonstrate sales success, but that such a period might be insufficient in the case of a dealership that has recently changed ownership or relocated.

when Devan relocated to Fairfield.  In addition, Devan has
produced evidence that could demonstrate that Infiniti knew, in
January 2002, that a market study would likely conclude that a
monitored or open point in Greenwich would be warranted; that
one of the purposes of the market study would be to assess the
viability of the Greenwich market for the possibility of
Infiniti representation; and that Infiniti was discussing the
possibility of re-opening a dealership in Greenwich with
Pecunies in August or September 2003, but not with Brostoff, who
had stated in his September 4, 2003 letter that Devan would be
exploring opportunities to relocate within Fairfield County; and
that Infiniti only informed Devan of the results of the market-
study after it had already sent a letter of commitment to
Pecunies.  The evidence produced by Devan is sufficient to
create a genuine issue of material fact as to whether Infiniti
concealed an intention to place a dealer back in Greenwich and
thus engaged in conduct that was immoral, unethical, oppressive,
or unscrupulous.  See De La Concha of Hartford, Inc. v. Aetna
Life Ins. Co., 269 Conn. 424, 443 (2004) ("[w]hether a practice
is unfair and thus violates CUTPA is an issue of fact.").
Because the court has concluded that Devan has created a genuine
issue of material fact as to whether Infiniti violated the
second prong of the "cigarette rule," it need not address
whether Devan has created a genuine issue as to the other two

prongs.  See Ventres v. Goodspeed Airport, LLC, 275 Conn. 105, 154 (Conn. 2005) (explaining that "[a]ll three criteria do not need to be satisfied to support a finding of unfairness" and "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three").

Infiniti renews its argument that Devan lacks standing to bring this CUTPA claim.  The court addressed this argument in the Order, stating:

> As to the defendant's argument that the plaintiff lacks standing to bring the CUTPA claim set forth in the First Count of the First Amended Complaint, the defendant's motion is being denied because the plaintiff has directed the court's attention to evidence of sufficient actionable conduct apart from that necessary to sustain a protest under the Connecticut Motor Vehicle Act, Conn. Gen. Stat. § 42-133dd, to the reopening of the Greenwich point.  Thus, even if the plaintiff had standing to bring an action under Conn. Gen. Stat. § 42-133dd, it has produced evidence supporting additional contentions that would allow it to also pursue a CUTPA claim...

(Order at 1).  Infiniti's attempt to re-litigate this issue is premised on its position that Devan has failed to produce evidence of any actionable conduct under CUTPA.  However, the court has concluded otherwise.  Thus, it finds unpersuasive the defendant's argument that Devan lacks standing to bring a CUTPA claim.

Infiniti also renews its argument that this CUTPA claim is barred by the Statute of Frauds, Conn. Gen. Stat. § 52-550.  The

court stated in the Order:

> As to the defendant's argument that the CUTPA claim set
> forth in the First Count of the First Amended Complaint
> is barred by the Statute of Frauds, Conn. Gen. Stat. §
> 52-550, the motion is being denied because proof of an
> oral contract is not necessary to maintain the
> plaintiff's CUTPA claim.  The applicable analysis was
> set forth in Wolf v. Giosa, No. CV055002481, 2006 Conn.
> Super. LEXIS 3044 (Conn. Super. Ct. Oct. 6, 2006).
> There, in discussing Foster Road Associates v. NJM
> Realty Limited Partnership, No. CV 940533485, 1996
> Conn. Super. LEXIS 2394 (Conn. Super. Ct. Sept. 13,
> 1996), the court stated:
>
> The plaintiff cannot avoid the bar of the Statute of
> Frauds by labeling the cause of action as one to recover
> damages for fraud where, as here, proof of a contract,
> void under the Statute of Frauds, is essential to
> maintain the action.  The court, however, further
> provided that "[o]ne can envision a set of facts in which
> a plaintiff might state a valid cause of action for
> negligent misrepresentation where it took actions in
> reliance on a seller's representations."
>
> Id. at *5 (citations omitted).  A comparable set of
> facts to that envisioned by the court in Foster is
> presented here.

(Order at 2).  In the instant motion, Infiniti argues that

discovery has not borne out the factual contentions supporting

Devan's claim, and thus there is no comparable set of facts to

that envisioned by Foster in this case.  Infiniti also argues

that any alleged representations by Infiniti occurred after

Devan entered into an agreement to purchase New Country, and

therefore Devan cannot show reliance so as to present a set of

facts envisioned by Foster.

 The court's conclusion has not changed.  Devan has produced

evidence of reliance in representations made by Infiniti prior

-34-

to the consummation of the purchase transaction. Devan's CUTPA
claim is based on those representations. Devan is not seeking
to use Infiniti's representations as evidence of any oral
contract between the parties. Thus, the Statute of Frauds does
not serve as a bar to a cause of action in situations envisioned
by Foster, namely those situations in which proof of a contract
is not essential to maintaining the cause of action.
Therefore, the defendant's motion for summary judgment is being
denied with respect to the First Count.

**B.    Second Count: Breach of Contract**

Devan brings a breach of contract claim against Infiniti,
alleging that Infiniti violated two provisions of the Agreement.
In order to prove a breach of contract under California law,
"the plaintiff must demonstrate a contract, the plaintiff's
performance or excuse for nonperformance, the defendant's
breach, and damage to the plaintiff." Amelco Electric v. City
of Thousand Oaks, 27 Cal.4th 228, 243, (2002).[12]

_____

[12] "As '[a] federal court sitting in diversity jurisdiction,'
the District Court is obligated to 'apply the law of the forum
state' in analyzing preliminary choice-of-law questions." Cap
Gemini Ernst & Young, U.S., L.L.C. v. Nackel , 346 F.3d 360, 365
(2d Cir. 2003). The Connecticut Supreme Court has stated: "[I]n
accordance with § 187 of the Restatement ... parties to a
contract generally are allowed to select the law that will govern
their contract, unless  either: (a) the chosen state has no
substantial relationship to the parties or the transaction and
there is no other reasonable basis for the parties' choice, or
(b) application of the law of the chosen state would be contrary
to a fundamental policy of a state which has a materially greater
interest than the chosen state in the determination of the

First, Devan argues that Infiniti violated § 2.E of the Agreement.  Section 2.E reads:

E. Evaluation of Dealership Facilities and Location

Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 2. In making such evaluations, Seller will give consideration to: the actual land and building space provided by Dealer for the performance of its responsibilities under this Agreement; the current Guides and Standards established by Seller for the Dealership Facilities; the appearance, condition and layout of the Dealership Facilities; the location of the Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area; and such other factors, if any, as may directly relate to Dealer's performance of its responsibilities under this Section 2.  Evaluations prepared pursuant to this Section 2.E will be discussed with and provided to Dealer, and Dealer shall have an opportunity to comment, in writing, on such evaluations, and Seller will consider Dealer's comments.  Dealer shall promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 2.

---

particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."  Elgar v. Elgar, 238 Conn. 839, 850 (1996) (internal quotation marks omitted).  Here, the court notes that the parties have selected California law to govern their contract.  See Pl.'s Ex. 25 at § 14F ("This Agreement shall be deemed to have been entered into in the State of California, and all questions concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligations of the parties hereof, shall be governed by and resolved in accordance with the internal laws of the State of California, including without limitation the statute of limitations.").  The court cannot conclude that the chosen state has no substantial relationship to the parties because Infiniti is a California corporation; nor can the court conclude that application of California law governing breach of contract claims is contrary to the fundamental policy of Connecticut in this case.

(Pl.'s Ex. 25 at § 2.E).  Devan argues that Infiniti failed to

use the criteria set forth in § 2.E for evaluating dealership

facilities and location when analyzing Devan's request to

relocate to Wilton and thereby breached the Agreement.  Devan

contends that Infiniti would have concluded that the Wilton

location was superior to the Fairfield location if it had used

these criteria.  Specifically, Devan contends that the Wilton

location provided for more land and building space; the Wilton

location would have met all guides and standards for the

appearance, condition, and layout of the facility; the Wilton

location would have provided Devan with more favorable sales

opportunities; and the Wilton location would have been superior

relative to the service requirements of its PMA.  Devan also

notes that proximity to competing dealerships is not listed as a

criterion for evaluating dealership facilities and location.

Reading § 2.E in context, the court concludes that Devan

has failed to create a genuine issue of material fact as to

whether Infiniti breached its terms because § 2.E applies to

periodic evaluations of a dealer's current facilities and

location; it does not require Infiniti to evaluate potential

relocation requests in accordance with the enumerated criteria.

The first line of § 2.E. states that "Seller will periodically

evaluate Dealer's performance of its responsibilities under this

Section 2," and the last line states that "Dealer shall promptly

take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 2."  This language makes clear that the context in which the enumerated criteria apply is a periodic evaluation of a dealer's performance of its responsibilities at the location at which it is currently operating.  "[T]he location of the Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area" is merely one criterion that the seller must consider in determinating whether a dealer is adequately performing its responsibilities at that location.  (Id.).

In addition, the Agreement explicitly addresses the issue of relocation.  Section 2.C of the Agreement provides that "Dealer shall not move, relocate, or change the usage of the Dealership Location...without the prior written consent of Seller", and neither § 2.C nor any other provision in the Agreement provides that the criteria enumerated in § 2.E must or should be used in evaluating a relocation request.  Therefore, the defendant is entitled to summary judgment on Devan's breach of contract claim based on the enumerated criteria for periodic evaluation of a dealership, set forth in § 2.E of the Agreement.

Second, Devan argues that Infiniti violated the provision of the Agreement which states that "Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed

intention to deal fairly with Dealer and the consuming public."
(Pl.'s Ex. 25 at 1).  Devan contends that Infiniti violated this
provision by rejecting Devan's request to relocate to Wilton,
ignoring criteria for evaluation of facilities set forth in the
Agreement, and discriminating against Devan in favor of other
dealers.  Devan also contends Infiniti made misrepresentations
about the market study performed in connection with the
relocation request in violation of the provision of the
Agreement which states that "Seller and Dealer shall refrain
from engaging in conduct or activities which might be
detrimental to or reflect adversely upon the reputation of
Seller, Dealer or Infiniti Products and shall engage in no
discourteous, deceptive, misleading or unethical practices or
activities."  (Id.).

    "Although a statement in a 'whereas' clause may be useful
in interpreting an ambiguous operative clause in a contract, it
cannot create any right beyond those arising from the operative
terms of the document."  Abraham Zion Corp. v. Lebow, 761 F.2d
93, 103 (2d Cir.1985) (internal quotations and citations
omitted).  The description of a contract's purposes is analogous
to a "whereas" clause.  See Aramony v. United Way of America,
254 F.3d 403, 413 (2d Cir. 2001).  The provisions relied upon
by Devan are contained in the section discussing the purposes of
the Agreement, under the caption "Introduction".  The last

sentence in this part of the Agreement states: "To achieve the purposes referred to above, Seller and Dealer agree as follows...." (Id.). Then, the specific provisions of the Agreement are set forth.

In addition, "it is a fundamental rule of contract construction that specific terms and exact terms are given greater weight than general language." Aramony, 254 F.3d at 413. Thus, the court gives greater weight to the specific and unambiguous terms of the Agreement prohibiting Devan from relocating without the express written consent of Infiniti than it gives to the general language discussing the purposes of the Agreement, and Devan fails to show how any alleged conduct on the part of Infinity constituted a breach of contract with respect to § 2.C of the Agreement. Therefore, the defendant's motion for summary judgment is being granted with respect to the Second Count.

## C. Third Count: Breach of Implied Covenant of Good Faith and Fair Dealing

Infiniti has moved for summary judgment on Devan's claim for breach of the implied covenant of good faith and fair dealing in connection with Infiniti's denial of Devan's request to relocate to Wilton. "[T]he law implies in every contract a covenant of good faith and fair dealing. The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the benefits of the

agreement." Egan v. Mutual of Omaha Ins. Co., 24 Cal.3d 809, 817 (1979).[13]  The implied covenant of good faith and fair dealing "may not be read to prohibit a party from doing that which is expressly permitted by an agreement," but it can be breached when a party to an agreement engages in conduct which is "contrary to the contract's purposes and the parties' legitimate expectations."  See Carma Developers (Cal.) Inc. v. Marathon Development California, Inc., 2 Cal.4th 342, 373-74 (1992).

At this stage of the litigation, the court must assess the record in the light most favorable to the plaintiff and draw all reasonable inferences in its favor.  Based on the evidence produced by Devan, the court concludes that Devan has created a genuine issue of material fact as to whether Infiniti breached the implied covenant of good faith and fair dealing when it denied Devan's request to relocate to Wilton.  Therefore, the defendant's motion for summary judgment is being denied with respect to the Third Count.

---

[13] "Because this cause of action is derivative of an action for breach of contract, the same choice of law analysis applies to the implied covenant claim as applies to the breach of contract claim."  See MM Global Serv. Inc. v. Dow Chemical Co., 283 F.Supp.2d 689, 692 (D.Conn. 2003) (internal citations omitted).

### D.    Fourth Count: CUTPA

Devan contends that Infiniti violated CUTPA by denying its request to relocate to Wilton in retaliation for Devan's filing the instant action against Infiniti.  At this stage of the litigation, the court must assess the record in the light most favorable to the plaintiff and draw all reasonable inferences in its favor.  Doing so, the court concludes that the plaintiff has produced sufficient evidence to create a genuine issue of material fact as to whether Infiniti violated CUTPA, <u>inter</u> <u>alia</u>, by denying Devan's request to relocate to Wilton in retaliation for Devan's filing of the instant action; such a genuine issue is created by evidence, <u>inter</u> <u>alia</u>, that Infiniti had an obvious motive for retaliating against Devan, that there were both advantages and drawbacks to Devan's proposed relocation to Wilton, that the Wilton location was superior to the Fairfield location for Infiniti sales based on Infiniti's own market-study, and that a senior representative of Infiniti inquired of Brostoff and Blitzer regarding the potential of selling of their dealership.  Therefore, the defendant's motion for summary judgment is being denied with respect to the Fourth Count.

## IV.   CONCLUSION

For the reasons set forth above, defendant Infiniti's Motion for Summary Judgment (Doc. No. 184) is hereby GRANTED in part and DENIED in part.  The Clerk shall enter judgment in

favor of the defendant as to the Second Count of the First
Amended Complaint.

It is so ordered.

Dated this 29th day of September 2008 at Hartford,
Connecticut.

                                      /s/ AWT
_____          
                              Alvin W. Thompson
                       United States District Judge